**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Criminal No. 25-486-1** |
| **TARIQ MITCHELL,** *also known as* **TYRIK MITCHELL,** *Defendant.* | |

**<u>MEMORANDUM</u>**

**COSTELLO, J.**                                                                                    **May 27, 2026**

A grand jury in the Eastern District of Pennsylvania returned an indictment charging

Defendant Tariq Mitchell with possession of a firearm by a convicted felon, in violation of 18

U.S.C. § 922(g)(1).  Mitchell moved to suppress the firearm at issue, which was seized following

a traffic stop conducted by a Pennsylvania State Trooper.  Mitchell contends that while the

Trooper properly stopped him to investigate a traffic infraction, the Trooper improperly extended

the traffic stop without reasonable suspicion of criminal activity.  After conducting a hearing, the

Court finds that the Trooper acted appropriately under the totality of the circumstances.

Accordingly, the Court will deny the suppression motion.

**I.        FACTUAL BACKGROUND**

On March 14, 2025, shortly after 1:30 p.m., Pennsylvania State Police Trooper Andrew

Michael Korrubin was driving in a marked patrol vehicle when he saw a white Nissan Maxima

(the "Vehicle") traveling northbound on I-95.  Transcript of Suppression Hearing, ECF No. 33, at

9.  Trooper Korrubin, who had been with the Pennsylvania State Police for approximately five

years and had conducted well over 2,000 traffic stops by that time, noticed that the Vehicle had a

tinted cover over the license plate, which prevented him from being able to read the registration

number.  *Id.* at 6-7, 9.  He also noticed that the rear and side windows of the Vehicle were tinted, preventing him from seeing inside the Vehicle.  *Id.* at 9-10.  Both the tinted license plate cover and the tinted windows violated the traffic code.  *Id.* at 10.  As a result, Trooper Korrubin activated his emergency equipment and pulled the Vehicle over.[1]  *Id.* at 8-10, 49.

Immediately upon approaching the passenger side of the Vehicle, Trooper Korrubin smelled the odor of raw marijuana coming from inside the car along with a strong odor of air freshener.  *Id.* at 17.  Trooper Korrubin was familiar with the smell of marijuana, both raw and burnt, from conducting countless investigations and traffic stops involving marijuana during his career.  *Id.* at 18.  Trooper Korrubin also observed multiple air fresheners hanging near the steering wheel and recognized that individuals sometimes use air fresheners to mask the odor of marijuana.  *Id.* at 17-19.

Trooper Korrubin further observed that the steering column appeared to have been tampered with or "punched out," a sign that someone may have tried to steal the car.  *Id.* at 17, 36.  In addition, Trooper Korrubin noticed that the center console near the shifter was not flush and flat, suggesting it too had been tampered with.  *Id.* at 17-18, 20.  At the time of the traffic stop, Trooper Korrubin had participated in approximately 250 narcotics investigations and 100 firearms investigations and completed 500 hours of specialized training on the "means and methods" of storing firearms and drugs inside vehicles.  *Id.* at 7-8.  From his training and experience, Trooper Korrubin was aware that individuals sometimes hid firearms, narcotics, and

---

[1]    Trooper Korrubin's patrol vehicle was equipped with a mobile video recorder or MVR that turned on when he activated his emergency equipment.  *Id.* at 10-11.  The MVR captured video but not audio of the traffic stop.  *Id.* at 11-12.  Trooper Korrubin was also wearing a body camera, which captured video and audio of his encounter with the Defendant.  *Id.* at 12, 14-16. The recordings made by the MVR and Trooper Korrubin's body camera were presented as evidence during the suppression hearing and corroborated Trooper Korrubin's testimony.

other items in a void under the center console. *Id.* at 20-21. In fact, Trooper Korrubin had recovered guns and drugs from the hidden area under the center console in other cases. *Id.*

Trooper Korrubin also noticed that in addition to the tinted rear and side windows, the front windshield was also tinted. *Id.* at 18. Trooper Korrubin thought the level of darkness of the tint was approximately 5%, which he characterized as "extremely dark." *Id.* at 21. In Trooper Korrubin's experience, individuals involved in illegal firearm or drug transactions relied on tinted windows to prevent anyone outside the car from seeing where hidden compartments were located and from being able to identify and describe individuals inside the car. *Id.*

After making these observations, Trooper Korrubin viewed Mitchell's driver's license and the registration and proof of insurance for the Vehicle. *Id.* at 21-23. Trooper Korrubin saw that the Vehicle was not registered to Mitchell but instead was registered to a third party, Mitchell's mother. *Id.* at 21-22. Trooper Korrubin also observed that the proof of insurance was expired. *Id.* at 23. Trooper Korrubin asked Mitchell if he could obtain an up-to-date insurance card. *Id.* While having this exchange with Mitchell, Trooper Korrubin noticed that Mitchell avoided making eye contact with him. *Id.*

As Mitchell used a cell phone to obtain current insurance information, Trooper Korrubin noticed that there were three cell phones inside the Vehicle. *Id.* at 24. Trooper Korrubin was aware that individuals involved in illegal drug transactions sometimes used multiple cell phones. *Id.* at 24-25. Sometimes these individuals used a "burner phone" so any illegal transactions conducted through the phone could not be traced back to them. *Id.* Trooper Korrubin also knew that cell phones were sometimes used to track drug couriers. *Id.* at 25.

After a few minutes, Mitchell obtained current proof of insurance for the Vehicle on his cell phone. *Id.* at 27. Trooper Korrubin asked Mitchell to accompany him back to his patrol

3

vehicle with his cell phone so Trooper Korrubin could verify the insurance information. *Id.* at 27-28. At this point, Trooper Korrubin had not yet had an opportunity to run computer checks on the Vehicle's registration and license plate or Mitchell's driver's license and criminal history, which are typical tasks Trooper Korrubin completed during traffic stops. *Id.* at 27-28, 36-37.

As Trooper Korrubin returned to his patrol vehicle to begin these tasks, he handed Mitchell a screwdriver to remove the license plate cover. *Id.* at 29, 59. Trooper Korrubin told Mitchell that he would not give him a ticket if he removed the cover. *Id.* at 59. As Mitchell proceeded to remove the cover, Tropper Korrubin began running Mitchell's information through the computer terminal in his patrol vehicle. *Id.* at 29-30.

After removing the license plate cover, Mitchell stood at Trooper Korrubin's front passenger window while he entered Mitchell's information into the computer. *Id.* at 33. As he did so, Trooper Korrubin began to ask Mitchell several questions. As an initial matter, Trooper Korrubin asked Mitchell why the Vehicle was not registered in his name. Body Camera Footage, Ex. 2 at 7:40-7:55. Mitchell responded that the Vehicle was a gift from his mother. *Id.* Trooper Korrubin thought it was odd that the Vehicle was still registered in his mother's name. ECF No. 33 at 33. When Trooper Korrubin accessed Mitchell's driving records, he found that Mitchell had a history of driving without a license and other driving offenses. *Id.* at 32.

As he transitioned to checking Mitchell's criminal history, Trooper Korrubin asked Mitchell if anyone had tried to steal the Vehicle. *Id.* at 36. Trooper Korrubin asked this question because of the punched out steering column he observed and the position of the center console. *Id.* Mitchell told Trooper Korrubin that the center console was "just broken." Ex. 2 at 9:30-9:45.

At this point, Trooper Korrubin was able to view Mitchell's criminal history, and he learned that Mitchell had previously been arrested for firearms and narcotics offenses. *Id.* at 32-

33. Among other things, the criminal record check revealed that Mitchell had been arrested for possession with intent to distribute narcotics. *Id.* at 38. After confirming that the criminal history he was viewing belonged to Mitchell, Trooper Korrubin asked Mitchell if he had been arrested before. *Id.* at 37; Ex. 2 at 11:33-11:45. Mitchell confirmed that he had. *Id*. at 11:40-11:45. Trooper Korrubin then asked what he was arrested for, and Mitchell said "drugs." *Id.* at 11:50-11:55. Trooper Korrubin followed up by asking "selling or just possessing?" *Id.* Mitchell said, "possession." *Id.* Having already smelled marijuana at the Vehicle, Trooper Korrubin replied, "don't tell me weed." ECF No. 33 at 38. Mitchell responded, "It was a long time ago." Ex. 2 at 11:50-12:10. As Trooper Korrubin continued to check Mitchell's criminal history, he asked Mitchell what he did for work and why he was carrying multiple cell phones. *Id.* at 12:34-46. Mitchell replied that he worked with autistic children, but he did not address why he had multiple phones in the Vehicle. *Id.*

As a next step, Trooper Korrubin sought to verify the updated proof of insurance Mitchell provided. ECF No. 33 at 35. To do this, Trooper Korrubin needed to confirm that the registration, proof of insurance, and Vehicle all bore the same vehicle identification number ("VIN"). *Id.* Trooper Korrubin exited his patrol vehicle to check the VIN on the Vehicle. *Id.* at 35, 39. When Trooper Korrubin attempted to check the VIN near the windshield, he found that it had slashes through it that made it illegible. *Id*. at 40. He opened the driver's door to look for a VIN plate near the door frame, but the Vehicle did not have a VIN plate in that location. *Id*. at 41. He then looked for the VIN on the "B pillar" near where the seatbelt attaches. *Id.* As he opened the door, Trooper Korrubin again noticed multiple air fresheners hanging from the steering wheel and smelled marijuana. *Id*. at 42. He also observed marijuana residue or "shake"

on the floor of the Vehicle.  *Id.* at 42; 79.  Trooper Korrubin was familiar with shake from his previous involvement in hundreds of narcotics investigations.  *Id.* at 42-43.

Based on his observations, Trooper Korrubin believed controlled substances would be found in the Vehicle.  *Id.* at 43.  He contacted a K-9 officer for assistance.  *Id*. at 44.  When the K-9 officer arrived, the officer circled the Vehicle and looked inside.[2]  Ex. 2 at 31:55-32:45.  The K-9 officer pointed out a marijuana "weed stem" he observed in the passenger side door.  *Id.* at 32:24-32:38.  Trooper Korrubin looked and observed the stem.  ECF No. 33 at 45.

After the K-9 alerted, Mitchell consented to a search of the Vehicle.  *Id*. at 46, 82-83.  Trooper Korrubin immediately checked the center console, knowing that individuals sometimes hid firearms, narcotics, and other items in the void underneath.  *Id.* at 20-21, 47.  Trooper Korrubin removed the center console and located a firearm hidden in the void.  *Id.* at 47-48.

Trooper Korrubin then arranged for the Vehicle to be transported to the police garage for a more thorough search.  *Id.* at 77.  At the garage, Mitchell again consented to a search of the Vehicle.  *Id.* at 77-78.  During this search, Trooper Korrubin still noticed the smell of marijuana and seized the weed stem he had observed in the passenger side door as well as another piece of suspected marijuana.  *Id.* at 78-79.

## II.   LEGAL STANDARD

Mitchell contends that the seizure of the firearm violated his Fourth Amendment rights.  Mitchell does not dispute that the initial traffic stop was lawful.  Instead, he argues that the firearm recovered from the Vehicle must be suppressed because Trooper Korrubin unconstitutionally extended the traffic stop beyond its intended purpose without justification.

---

[2]     K-9 handlers conduct a "sweep" to make sure there are no knives, syringes, or other items that could harm the K-9 once it enters the vehicle to conduct a search.  ECF No. 33 at 83.

The Fourth Amendment guarantees an individual's right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Law enforcement officers may lawfully "seize" a vehicle by pulling it over to investigate a violation of the traffic laws. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). A traffic stop that is lawful at its inception may become an unreasonable intrusion if law enforcement extends the traffic stop beyond its initial purpose without justification. *United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Thus, an officer may not "divert[] from a stop's traffic-based purpose to investigate other crimes" without reasonable suspicion of criminal activity. *United States v. Stewart*, 92 F.4th 461, 467-68 (3d Cir. 2024) (citing *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018)). Relevant here, law enforcement officers may not extend an otherwise-completed traffic stop to conduct a dog sniff of the stopped vehicle absent reasonable suspicion of illegal activity. *Rodriguez v. United States*, 575 U.S. 348, 350 (2015).

Whether a traffic stop is extended beyond its proper duration and scope is determined by assessing whether and when the "mission" of the traffic stop was completed. *Id.* at 354. The point at which an officer diverts from a traffic-based investigation to the investigation of other crimes is referred to as the "*Rodriguez* moment." *Green*, 897 F.3d at 179 (citing *Rodriguez*, 575 U.S. at 354-55).

The mission of a traffic stop typically includes addressing the traffic violation and attending to related safety concerns. *Rodriguez*, 575 U.S. at 354. In addition to determining whether to issue a traffic ticket, an officer's mission includes "'ordinary inquiries incident to [the traffic] stop.'" *Id.* at 355 (quoting *Caballes*, 543 U.S. at 408). These inquiries typically involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance. *Rodriguez*, 575 U.S. at

7

355.  Officer safety tasks, including ordering occupants out of a vehicle and conducting routine criminal history checks, are also part of the stop's mission.  *United States v. Ross*, 151 F.4th 487, 497-98 (3d Cir. 2025) (internal citations omitted).  "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly."  *Rodriguez*, 575 U.S. at 355.

"To lawfully extend a stop beyond when tasks tied to its initial mission are completed or reasonably should have been completed, an officer must have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring."  *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (citing *Rodriguez*, 575 U.S. at 355; *Clark*, 902 F.3d at 410).  The officer must have "more than a hunch," but something short of "proof of wrongdoing by a preponderance of the evidence."  *Garner*, 961 F.3d at 271 (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968) and *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

In determining whether reasonable suspicion exists, the court considers "the totality of the circumstances—the whole picture."  *United States v. Cortez*, 449 U.S. 411, 417 (1981).  This includes "the particular ability of law enforcement officers, based on training and experience, to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *Green*, 897 F.3d at 183 (internal citation and quotations omitted).  "[R]easonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each."  *Id.* (citing *District of Columbia v. Wesby*, 583 U.S. 48, 67 (2018)).

**III.    DISCUSSION**

Mitchell contends that Trooper Korrubin impermissibly extended the traffic stop in this case.  Mitchell argues that the *Rodriguez* moment occurred approximately seven minutes into the stop, immediately after Trooper Korrubin allowed him to remove the tinted license plate cover and indicated he was not going to issue a citation.  ECF No. 26 at 6.  Mitchell claims that because Trooper Korrubin had decided not to issue a ticket for a traffic infraction, the purpose of the stop was complete, and any investigation conducted after that point was improper.  This argument is flawed.

As is explained above, the mission of a traffic stop is not limited to determining whether to issue a ticket.  *See Rodriguez*, 575 U.S. at 355.  Even though Trooper Korrubin had decided not to issue a citation, he had not concluded the traffic stop.  Among other things, Trooper Korrubin had not yet entered the updated insurance information into his computer terminal, checked Mitchell's driving record and criminal history, or verified whether the proof of insurance listed the same VIN as the Vehicle.  These routine checks are ordinary components of a traffic stop.  *See Ross*, 151 F.4th at 495; *Rodriguez*, 575 U.S. at 355.  Moreover, it would have been careless to release the Vehicle before completing these basic safety checks.  Thus, the mission of the traffic stop was not complete at the time of Mitchell's suggested *Rodriquez* moment.

However, even if this Court accepted Mitchell's proposed *Rodriquez* moment, Trooper Korrubin was justified in extending his investigation beyond the mission of the traffic stop based on his observations up to that point.  By the time Trooper Korrubin handed Mitchell a screwdriver and informed Mitchell he was not going to issue a citation, Trooper Korrubin had "an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring."  *Garner*, 961 F.3d at 271.

Specifically, Trooper Korrubin had already observed: (1) an obscured license plate; (2) darkly tinted windows; (3) a driver who avoided eye contact; (4) a vehicle registered to a third party; (5) a "punched out" steering column; (6) a center console that was not flush and flat, suggesting a hiding place underneath; (7) the odor of raw marijuana coming from inside the car along with a strong odor of air freshener; and (8) multiple cell phones inside the Vehicle.

These observations, taken together, led Trooper Korrubin to reasonably believe that evidence of criminal activity, such as the possession of controlled substances, would be found inside the Vehicle. Indeed, the odor of marijuana alone may be sufficient to support reasonable suspicion in these circumstances. *See Green*, 897 F.3d at 186 (quoting *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006)). It may even be sufficient to establish probable cause. *Id.* Therefore, any expansion of Trooper Korrubin's investigation after Mitchell's proposed *Rodriguez* moment was completely justified.

Perhaps because the odor of marijuana alone may be sufficient to support reasonable suspicion, Mitchell argued at the suppression hearing that there was no evidence corroborating Trooper Korrubin's claim that he smelled marijuana when he approached the Vehicle. ECF No. 33 at 85. Specifically, Mitchell argued that "the smell of marijuana is an afterthought after they find the marijuana, and it's not until they find the marijuana." *Id.* Mitchell further argued that there was no evidence presented at the suppression hearing, such as a lab test, that confirmed that the weed stems recovered from the Vehicle were in fact marijuana, which calls into question whether Trooper Korrubin smelled marijuana during the traffic stop. *Id.* at 89.

This argument is easily rejected. As an initial matter, the Government is under no obligation to prove that the weed stems were marijuana. The question is not whether marijuana was ultimately found in the Vehicle. Rather, the question is whether Trooper Korrubin had

10

"more than a hunch" that the Vehicle contained controlled substances. *Garner*, 961 F.3d at 271 (citing *Terry*, 392 U.S. at 27 and *Sokolow*, 490 U.S. at 7).

Moreover, there is no evidence to support Mitchell's suggestion that Trooper Korrubin lied when he testified that he smelled raw marijuana when he approached the Vehicle during the traffic stop.  On the contrary, the evidence corroborates Trooper Korrubin's testimony.  The encounter with Mitchell was recorded.  Those recordings are completely consistent with Trooper Korrubin's testimony.  While the recordings cannot verify whether Trooper Korrubin smelled raw marijuana at the scene, and Trooper Korrubin never mentioned that he smelled marijuana to Mitchell, it is noteworthy that the K-9 alerted when it checked the Vehicle.  The K-9's detection of the smell of marijuana in the Vehicle corroborates Trooper Korrubin's testimony on this point.  Based on the evidence presented, as well as Trooper Korrubin's demeanor at the hearing, the Court finds his testimony completely credible and finds no reason to doubt his testimony that he smelled the odor of raw marijuana when he approached the Vehicle.

Next, Mitchell argues that Trooper Korrubin lacked reasonable suspicion because some of Trooper Korrubin's observations did not suggest criminal activity.  For example, Mitchell pointed out that it is not illegal to possess multiple phones and that individuals sometimes use separate phones for work.  ECF No. 33 at 56-58.  Mitchell also pointed out that having air fresheners in a car is not inherently suspicious or uncommon.  *Id.* at 58.  Moreover, Mitchell pointed out that he was completely cooperative and responded appropriately to all of Trooper Korrubin's questions and requests.  *Id.* at 53, 61-62.  According to Mitchell, this was not typical behavior for someone who was hiding something.

Perhaps Mitchell is correct that, taken individually, these factors are not in themselves suspicious.  But courts do not view the evidence that way in these situations.  Instead, courts

consider the totality of the circumstances.  Considering Trooper Korrubin's observations as a whole, he had reasonable suspicion of criminal activity at the time of Mitchell's suggested *Rodriguez* moment.

However, as stated above, the traffic stop was not complete when Trooper Korrubin decided not to issue a traffic citation, as Mitchell suggests.  Instead, the mission of the traffic stop continued until Trooper Korrubin confirmed that the VIN on the Vehicle matched the VIN on the registration and proof of insurance.  At that point, Trooper Korrubin had completed all tasks related solely to the traffic stop.

The extension of the traffic stop beyond that point and beyond its initial purpose, was justified.  There is no question that Trooper Korrubin had reasonable suspicion of criminal activity at that point.  In addition to the observations listed above, which themselves were sufficient to establish reasonable suspicion, Trooper Korrubin made the following additional observations before the conclusion of the traffic stop: (1) that Mitchell's driving record included numerous traffic infractions, including for driving without a license; (2) that Mitchell had previously been arrested for firearms and drug offenses; and (3) that "shake" was present on the floor of the Vehicle.

Taken together, Trooper Korrubin's observations easily justified expanding his investigation by calling for a K-9 officer to check the Vehicle for controlled substances.  *See Stewart*, 92 F.4th at 468 (3d Cir. 2024) (holding that defendant's evasive answers, vehicle's dark window tint, vehicle's registration in the name of third party, defendant's prior arrests, including by the Drug Enforcement Administration, and defendant's interstate travel along known drug corridor all weighed in favor of conclusion that Trooper had reasonable suspicion to extend traffic stop).  Because Trooper Korrubin had reasonable suspicion justifying the extension of his

investigation beyond the mission of the traffic stop, his subsequent recovery of the firearm did not violate Mitchell's Fourth Amendment rights.

## IV.    CONCLUSION

Trooper Korrubin did not unlawfully prolong or expand the traffic stop in this case. During the traffic stop, Trooper Korrubin made observations and obtained information that justified further investigation.  Trooper Korrubin's recovery of the firearm from the Vehicle, therefore, did not violate the Fourth Amendment.  The Court will deny Mitchell's motion to suppress.

An appropriate Order follows.

**BY THE COURT:**

_____

MARY KAY COSTELLO, J.

13